J-S74032-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JOHN GORMAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| ARIA HEALTH, ARIA HEALTH SYSTEM, | : | |
| AND BRIAN P. PRIEST, M.D. | : | |
| | : | |
| | : | |
| APPEAL OF:  JAMES M. MCMASTER, | : | |
| EXECUTOR OF THE ESTATE OF JOHN | : | |
| GORMAN | : | No. 1234 EDA 2014 |

Appeal from the Order Entered March 17, 2014,
in the Court of Common Pleas of Philadelphia County,
Civil Division at No(s):  May Term, 2012 No. 557

BEFORE:  BENDER, P.J.E., DONOHUE and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED MARCH 05, 2015**

James M. McMaster, Executor of the Estate of John Gorman, (the Estate) appeals from an order that granted the motion for summary judgment filed by Aria Health (Aria) and Brian P. Priest, M.D. (Dr. Priest) (collectively Appellees).  We reverse and remand for further proceedings.

On May 9, 2012, John Gorman (Mr. Gorman) initiated this action by filing a praecipe to issue a writ of summons against Appellees and Aria Health System.  On July 19, 2012, Mr. Gorman filed a complaint against the same parties.  The complaint consisted of one count of professional negligence and one count of corporate negligence.

Mr. Gorman died on October 8, 2012, and James M. McMaster, executor of Mr. Gorman's estate, later was substituted as the plaintiff in this

_____
* Retired Senior Judge assigned to the Superior Court.

matter. We further note that the parties stipulated to dismissing Aria Health System from the action and to dismissing Mr. Gorman's corporate negligence count.

The trial court offered the following summary of the factual history of this case.

> This lawsuit stems from Dr. Priest's performance of a July 12, 2004, coronary artery bypass graft carried out at the facility of [] Aria. During the surgical procedure, Dr. Priest failed to remove a large chest tube which would remain in [] Appellant's chest until his passing. [Mr. Gorman] allege[d in his complaint] that, as a result of the retained chest tube, he incurred a fibrotic reaction in the left pleural space, aggravation of dyspnea on exertion, aggravation of interstitial lung disease, restriction of pulmonary function, damage to the lungs, anxiety, depression, a loss of life's pleasures, pain and suffering, and additional injuries. [He further alleged that, in May of 2012, he was told for the first time that the retained chest tube was causing him pathology and complications.]
>
> On May 17th, 2009, [Mr. Gorman] had a CT scan of his chest performed. Dr. Segal examined and informed [Mr. Gorman] that there appeared to be a chest tube or tracking in his chest, but was not sure which it was. During a July 14, 2009, visit with Dr. G. Chris Christensen, III, [Mr. Gorman] was first advised there was definitely a tube in his chest. In September of 2009, [Mr. Gorman], accompanied by his daughter and son-in-law, was examined by Dr. D'Alonzo who informed [Mr. Gorman] that he absolutely had a chest tube in his chest. [Mr. Gorman] was also told that removing the chest tube would ultimately do more harm than good.

Trial Court Opinion, 6/4/2014, at 2 (citations omitted).

Appellees eventually filed a motion for summary judgment. Therein, they maintained that Mr. Gorman was aware of the retained chest tube and that the tube could cause health issues by, at the latest, September 7, 2009.

Thus, according to Appellees, the two-year statute of limitations expired in September of 2011.[1] Because Mr. Gorman did not initiate this action until May of 2012, Appellees contended that the statute of limitations bars the professional negligence claim.

In response to the motion for summary judgment, Mr. Gorman conceded that, in 2009, he knew that the tube remained in his chest. However, he stated that, at that time, he was unaware of the risks that the tube presented and was not advised that he suffered damage as a result of the tube. Mr. Gorman asserted he was told that there was greater risk of harm if he had the tube removed than if he allowed it to remain in his chest. According to Mr. Gorman, "[i]t was not until it became clear that the large pleural effusion was due to the retained chest tube that [Mr. Gorman] reasonably discovered he had an action against [Appellees]." Memorandum of Law in Opposition to Motion for Summary Judgment, 2/28/2014, at unnumbered page 8). Mr. Gorman argued that summary judgment was inappropriate because a genuine issue of material fact remained as to when he discovered that the tube caused him to be injured.

The trial court granted the motion for summary judgment. The court offered the following rationale in support of its decision.

> [Mr. Gorman] claims that the statute of limitations was tolled until May 2012, when he was advised that the chest tube left inside of him from the July 12, 2004 surgery was causing his

---

[1] The parties do not dispute that Mr. Gorman's medical malpractice claim is subject to a two-year statute of limitations. 42 Pa.C.S. § 5524(2).

complications. However, contrary to [this] argument, actual knowledge of the exact nature of the injury is not the trigger for the running of the statute of limitations. Under Pennsylvania's application of the discovery rule doctrine, it is not required that [Mr. Gorman] actually receives a precise medical diagnosis stating Appellees' conduct was the cause of a particular injury for the statute of limitations to begin. Instead, Pennsylvania courts have repeatedly held that this standard requires the statute of limitations to run from the time plaintiff discovered or should reasonably have discovered the cause of harm or injury. In determining when a discovery should have been made, three independent phases of knowledge must be known or knowable to plaintiff before the limitation period commences: (1) the injury; (2) the operative cause of the injury; and, (3) the causative relationship between the injury and the operative conduct.

Here, all three prongs of the test are met. First, [Mr. Gorman] and his family were well aware of his injury as they were put on notice numerous times in 2009 that [Mr. Gorman] had a tube in his chest. The presence of the tube in [Mr. Gorman's] chest is, in and of itself, an actionable injury; indicating medical negligence on the part of the treating surgeon for failure to remove it. Moreover, [Mr. Gorman] admitted in his October 3, 2012 deposition that during a July 14, 2009 visit with Dr. Christensen, he was informed that he had a tube in his chest and that he understood that it should not have been there. Further, [Mr. Gorman] stated that the only operation he has ever had on his chest was the coronary artery surgery performed by Dr. Priest in 2004. In addition, [Mr. Gorman's] daughter has stated that she, her father, and husband were all present for a September 2009 office visit with Dr. D'Alonzo who informed them [Mr. Gorman] absolutely had a chest tube in his chest. Thus, [Mr. Gorman] should have been more than aware of the operative cause of his injury and the causal relationship between the two.

The applicable law clearly demonstrates that the statute of limitations began to run when [Mr. Gorman] learned, or should have learned, that there was a tube in his chest that should not have been there in July of 2009, or at the latest, September 2009. There are no Pennsylvania cases which allow extension of the statute of limitations after an ascertainable tortious episode where there has not been fraud or concealment. It is of no

consequence that [Mr. Gorman] first learned the chest tube was causing complications until May 2012. The confirmation in 2009 from Dr. Christensen that this foreign object was in fact a chest tube triggered the running of the statute of limitations. There are ample facts that would suggest the tube must have been left in [Mr. Gorman's] chest during his 2004 coronary artery surgery, the most obvious fact being it was the only surgery ever performed on his chest.

Although [Mr. Gorman] presents a sympathetic argument that he did not bring a lawsuit because he believed from his doctor that the actual removal of the tube might cause more harm than simply letting the tube remain; this is not a legally recognized basis for not instituting an action. This issue is actually an issue concerning proof of damages; it is not an issue of when a lawsuit must be filed. The discovery of a surgical implement, having been left in a patient through a negligent act, commences the statute of limitations.

Upon learning there was a chest tube inside of his body that should not have been there, [Mr. Gorman] had a cause of action with which to bring a lawsuit. [Mr. Gorman] filed suit in July 2012, almost ten months after the two year statute of limitations had run from the latest applicable date according to the facts, September 2009. Therefore, because the statute of limitations began to run when [Mr. Gorman] first learned he had a chest tube in his chest in either July or September of 2009, and because [Mr. Gorman] filed his lawsuit in July 2012 well after the statute of limitations had expired, [he] is barred from trying this case.

Trial Court Opinion, 6/4/2014, at 3-5 (citations and quotation marks omitted).

After the Estate was substituted as the plaintiff, it timely filed a notice of appeal. The court did not direct the Estate to comply with Pa.R.A.P. 1925(b). In its brief to this Court, the Estate asks us to consider the following questions:

A. Did the lower [c]ourt err in granting the Motion for Summary Judgment on the basis that more than two years had passed since [Mr. Gorman] discovered a tube had been left in his chest during a surgical procedure and [Mr. Gorman] was therefore not reasonably diligent? [Mr. Gorman] alleged he discovered his right of action when he learned he actually suffered injury as a result of the tube remaining in his chest and commenced his action within two years of that date and the [c]ourt held the statute of limitations began to run when decedent was made aware the chest tube was left in his chest[.]

B. Did the lower [c]ourt err in granting the Motion for Summary Judgment when there was a material issue of fact as to when [Mr. Gorman] discovered he had a cause of action against [Appellees] and as to whether he was reasonably diligent in learning his condition and injury?

The Estate's Brief at 4 (trial court's answers omitted).

We review orders granting summary judgment as follows.

The standards which govern summary judgment are well settled. When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion.…

***Swords v. Harleysville Ins. Companies***, 883 A.2d 562, 566-67 (Pa. 2005) (citations omitted).

We begin our analysis by rejecting the trial court's assertion that "[t]he presence of the tube in [Mr. Gorman's] chest is, in and of itself, an actionable injury[.]" Trial Court Opinion, 6/4/2014, at 4. Our conclusion in this regard is guided by this Court's decision in *Gregorio v. Zeluck*, 678 A.2d 810 (Pa. Super. 1996).

In November of 1988, Patricia Gregorio gave birth to a baby; Dr. Zeluck performed her episiotomy. After the delivery of the baby, the incision for the episiotomy was packed with sponges.

> Approximately five days after her delivery, Ms. Gregorio complained that she was not feeling well. Specifically, she was itching, was not able to get comfortable when trying to fall asleep, and was bleeding; she was concerned because the bleeding was very dark. Ms. Gregorio telephoned [Dr. Zeluck's] office, spoke with the receptionist … and was told by [the receptionist] that the symptoms Ms. Gregorio described were normal; the itching was caused by the stitches, and bleeding was expected after delivery. [The receptionist] assured Ms. Gregorio that she would inform the doctors of her call. A couple of days later, Ms. Gregorio again spoke with [the receptionist], who reassured her that her symptoms were not unusual. After several more days, Ms. Gregorio experienced pain in her lower abdomen, and detected a very bad odor. She called the doctors' office several more times, and was advised that her "insides were shrinking back to normal" and that the doctors did not need to see her until her regularly scheduled six week checkup.

> According to Ms. Gregorio, she began to feel compelled to avoid people, even her baby, as a result of the odor she was experiencing; she was fearful people would notice the smell. Several weeks later, while in the shower, Ms. Gregorio felt a foreign object protruding from her vagina. After pulling it out, she telephoned the doctors' office; it was determined that the object was a piece of surgical packing left inside of her after the delivery.

The Gregorios filed a complaint against [Dr. Zeluck and his practice] alleging medical malpractice based on the failure of the attending doctor, Dr. Zeluck, to remove sponges following the delivery, and on the failure of the doctors to respond to Ms. Gregorio's complaints of odor. A jury trial commenced[]. At the conclusion of the Gregorios' case, the doctors moved for a compulsory nonsuit.… [The trial court] granted the doctors' motion. The Gregorios' motion for reconsideration and post-verdict relief was denied. [The Gregorios appealed to this Court.]

*Zeluck*, 678 A.2d at 812.

On appeal, this Court examined, *inter alia*, "whether Dr. Zeluck's failure to remove the sponge resulted in harm to Ms. Gregorio." *Id.* at 813. In so doing, the Court offered the following analysis.

We conclude that the Gregorios failed to establish any link between Dr. Zeluck's negligence and a legally cognizable injury. It was established that any physical pain experienced by Ms. Gregorio during the days following labor was not related to Dr. Zeluck's negligence. In fact, the testimony revealed that Ms. Gregorio had no abnormal physical pain related to the sponge; it is the unpleasant odor resulting from the sponge of which Ms. Gregorio complains.

Not every wrong constitutes a legally cognizable cause of action.... Not every loss constitutes a legal injury for which compensation is available. In an analogous case addressing the compensable harm issue, the Pennsylvania Supreme Court was asked to determine specifically whether asymptomatic pleural thickening, *i.e.*, unaccompanied by disabling consequences or physical impairment, is a compensable injury giving rise to a cause of action. The Court concluded that no physical injury was established necessitating an award of damages. Similarly, in *Lubowitz v. Albert Einstein Medical Center*, 424 Pa.Super. 468, 623 A.2d 3 (1993), this [C]ourt found no legally cognizable injury in an appellant's fear that she would develop the AIDS virus after being exposed to it. We concluded that appellant, in her asymptomatic state, could not recover monetary damages.

- 8 -

> Likewise, in the instant case, Ms. Gregorio suffered no disabling consequences, physical impairment, or physical symptoms as a result of her odor. While we sympathize with Ms. Gregorio and the unpleasant experience she endured, we find that the odor resulting from Dr. Zeluck's negligence is not a sufficient physical injury to warrant damages.

*Zeluck*, 678 A.2d at 813-14 (citations, footnotes, and quotation marks omitted).

*Zeluck* demonstrates that the mere existence of a foreign object retained in a patient's body after a surgery does not amount to a medical malpractice cause of action. Rather, such a cause of action exists when the patient has suffered a compensable injury due to the negligent act of leaving the foreign object in the patient's body.

Therefore, we proceed to the Estate's argument that there exists an genuine issue of material fact as to whether the statute of limitations bars the medical malpractice claim. In so doing, we note the following principles of law.

> Medical malpractice is defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services. [T]o prevail in a medical malpractice action, a plaintiff must establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm.

*Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 321-22 (Pa. Super. 2007) (citations and quotation marks omitted).

Our Supreme Court has explained the statute of limitations and the discovery rule as follows.

> The discovery rule originated in cases in which the injury or its cause was neither known nor reasonably knowable. The purpose of the discovery rule has been to exclude from the running of the statute of limitations that period of time during which a party who has not suffered an immediately ascertainable injury is reasonably unaware he has been injured, so that he has essentially the same rights as those who have suffered such an injury.

> As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause….

> Therefore, when a court is presented with the assertion of the discovery rules application, it must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause. Since this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it. Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law.

> When the discovery rule applies, the statute of limitations does not commence to run at the instant that the right to institute suit arises, *i.e.*, when the injury occurs. Rather, the statute is tolled, and does not begin to run until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct. Whether the statute of limitations has run on a claim is a question of law for the trial court to determine; but the question as to when a party's injury and its cause were discovered or discoverable is for the jury.

*Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005) (citations and quotation marks omitted).

- 10 -

When the record is viewed in a light most favorable to Mr. Gorman, it establishes, in relevant part, the following. Mr. Gorman had breathing problems relating back to 1998. Those problems progressed, causing him to see a pulmonologist, Marcia Segal, D.O., in February of 2009. After Mr. Gorman's May 5, 2009 follow-up appointment, Dr. Segal authored a report wherein she diagnosed Mr. Gorman with idiopathic pulmonary fibrosis and/or usual interstitial pneumonitis. Dr. Segal also observed a retained left-side chest tube or tracking in a CAT scan of Mr. Gorman's chest. Mr. Gorman saw Dr. Segal for another follow-up appointment on June 30, 2009.

On July 14, 2009, Mr. Gorman saw pulmonologist G. Chris Christensen, III, D.O. Dr. Christensen authored a report wherein he diagnosed Mr. Gorman with idiopathic fibrosis and noted the presence of the retained tube. While Dr. Christensen's report states that some fibrotic changes appeared to have occurred, he also observed no evidence of an infection in that area. Moreover, Dr. Christensen opined that there was clear evidence of the lung disease in 2002 and suspected the onset of the disease to predate that year. Both Dr. Segal and Dr. Christensen suggested that Mr. Gorman follow up at Temple University.

On September 7, 2009, Mr. Gorman saw Gilbert D'Alonzo, D.O., for a second opinion. Dr. D'Alonzo found Mr. Gorman's lung disease to be consistent with idiopathic pulmonary fibrosis and usual interstitial pneumonitis. Dr. D'Alonzo's report notes that Mr. Gorman "does have a

retained fragment of a left chest [*sic*], which does not seem to be a problem." Motion for Summary Judgment, 1/31/2014, at Exhibit B.[2] Dr. D'Alonzo stated that he would not tamper with the chest tube.

None of the medical reports of record indicates that the multiple physicians who treated Mr. Gorman believed the retained chest tube in any way was causing Mr. Gorman's lung difficulties. In fact, Dr. D'Alonzo's report seems to suggest that he believed the tube was not problematic.

Dr. Christensen continued to treat Mr. Gorman. According to Mr. Gorman's deposition testimony, which occurred on October 3, 2012, the first time a doctor informed him that the chest tube was causing him any problem was in a letter written by Dr. Christensen. Mr. Gorman could not recall when Dr. Christensen sent that letter, but he speculated that it could have been a year-and-a-half ago. Motion for Summary Judgment, 1/31/2014, at Exhibit B, Mr. Gorman's 10/3/2012 afternoon deposition testimony, at 13. That letter is in the record but is not dated. It states, *inter alia*, Dr. Christensen's belief that "there is a contributing element of [Mr. Gorman's] restriction caused by the retained chest tube causing a fibrotic reaction in the left pleural space." Motion for Summary Judgment, 1/31/2014, at Exhibit B.

Mary Ellen McMaster, Mr. Gorman's daughter, stated at her deposition that she learned for the first time that the tube was a problem for her father

_____

[2] Exhibit B of Appellees' motion for summary judgment is lengthy. Dr. D'Alonzo's report is located at the end of that exhibit.

from a report authored by Dr. Christensen. She believed Dr. Christensen wrote the report in "2011 or 2012." Motion for Summary Judgment, 1/31/2014, Exhibit C, at 32. James McMaster, Mary Ellen McMaster's husband, testified at his deposition that Dr. Christensen informed the family that the tube made Mr. Gorman's lung disease worse.

In its present state, the record demonstrates that Dr. Priest owed Mr. Gorman a duty when he performed the 2004 surgery. The record further suggests that Dr. Priest breached that duty in 2004 by failing to remove tubing from Mr. Gorman's chest. While Mr. Gorman clearly discovered that breach of duty in 2009, the record is unclear as to whether the retained tube caused him to be injured and, if so, when Mr. Gorman learned or should have learned of that injury. Stated differently, questions of fact remain as to whether Dr. Priest's alleged breach of duty caused Mr. Gorman a compensable injury and when Mr. Gorman learned or should have learned of the existence of such an injury. The answers to these questions will inform a determination of whether the statute of limitations bars Mr. Gorman's medical malpractice claim. A jury should make such factual determinations. *Fine*, 870 A.2d at 859.

For these reasons, we conclude that the trial court erred by granting Appellees' motion for summary judgment. Accordingly, we reverse the trial court's order and remand for further proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/5/2015